IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| Melissa Adkins, | CASE NO. 3:22-cv-01869 |
| Plaintiff, | DISTRICT JUDGE James R. Knepp II |
| vs. | |
| Commissioner of Social Security Administration, | MAGISTRATE JUDGE James E. Grimes Jr. |
| Defendant. | **REPORT & RECOMMENDATION** |

Plaintiff Melissa Adkins filed a complaint against the Commissioner of Social Security seeking judicial review of its decision denying disability insurance benefits. This Court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c). The Court referred this matter to a Magistrate Judge under Local Rule 72.2(b)(1) for the preparation of a Report and Recommendation. Following review, and for the reasons stated below, I recommend the District Court affirm the Commissioner's decision.

## Procedural background

In June 2020, Adkins filed an application for disability insurance benefits alleging a disability onset date of February 27, 2020,[1] and claiming that she was disabled due to discogenic and degenerative disorders of the back

---

[1]     "Once a finding of disability is made, the [agency] must determine the onset date of the disability." *McClanahan v. Comm'r of Soc. Sec.*, 193 F. App'x 422, 425 (6th Cir. 2006).

and osteoarthritis.[2] Tr. 69, 203. The Commissioner denied Adkins's application at the initial level and upon reconsideration. Tr. 69–74, 75–83. Adkins requested a hearing before an Administrative Law Judge (ALJ). *See* Tr. 100. In June 2021, an ALJ held a hearing at which Adkins and a vocational expert testified. Tr. 32–68. In August 2021, the ALJ issued a written decision finding that Adkins was not disabled. Tr. 12–31. The ALJ's decision became final in August 2022, when the Appeals Council declined further review. Tr. 1–6; *see* 20 C.F.R. § 404.981. Adkins filed this action in October 2022. Doc. 1. Adkins argues that the ALJ's residual functional capacity (RFC)[3] determination is not supported by substantial evidence because:

    A. Ms. Adkins cannot sustain light work as set forth in the ALJ's residual functional capacity determination; and

    B. The ALJ's determination does not adequately account for Ms. Adkin's mental limitations.

Doc. 6, at 5, 7, 9.

## Factual background

*1. Personal and vocational evidence*

Adkins was born in November 1967 and was 52 years old on the alleged

---

[2]    In her brief, Adkins adopts the findings of the ALJ with respect to her list of severe impairments. Doc. 6, at 2–3.

[3]    An RFC is an "assessment of" a claimant's ability to work, taking his or her "limitations … into account." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Circ. 2002). Essentially, it is the Social Security Administration's "description of what the claimant 'can and cannot do.'" *Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 631 (6th Cir. 2004) (quoting *Howard*, 276 F.3d at 239).

onset date. Tr. 26, 69. Adkins lives with her fiancé and her two granddaughters, whom Adkins is raising. Tr. 40–41. Adkins attended school through the tenth grade and obtained her GED. Tr. 39, 42. She used to work as a production operator at a popcorn factory. Tr. 44, 196–97.

### 2. *Medical evidence*

*Cervical and thoracic spine issues*. Adkins established care with Marion Area Physicians in January 2020. Tr. 595–605. Adkins's primary care was handled by nurse practitioner Rachel Rollins. *Id*. Rollins found that Adkins had a decreased range of motion in the lumbar spine. Tr. 599. Initial x-rays showed severe degenerative disc disease and associated facet arthrosis at L5–S1, and mild degenerative disc disease at L3–L4 and L1–S2.[4] Tr. 302. Adkins's sacrum and sacroiliac joints were normal. Tr. 302.

In February 2020, Adkins sought emergency medical care at Marion General Hospital for numbness in all four extremities, ataxia[5] of gait, and

---

[4]    Vertebrae in a person's spine are given letter and number designations according to their location. The neck—the cervical spine—has seven vertebrae designated as C1 through C7. *See* Thomas Scioscia, M.D., Vertebrae in the Vertebral Column, Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/vertebrae-vertebral-column [https://perma.cc/R9MM-TBZT]. The twelve vertebrae comprising the upper spine—the thoracic spine—are labeled at T1 through T12. *Id*. The five vertebrae in the lower spine—the lumbar spine—are L1 through L5. *Id*. The five vertebrae at the bottom of the spine—in the sacrum—are labeled as S1 through S5. Thomas Scioscia, M.D., *Sacrum* (Sacral Region), Spine-health Resources, https://www.spine-health.com/conditions/spine-anatomy/sacrum-sacral-region [https://perma.cc/S2BR-RBTB].

[5]    Ataxia is muscular coordination failure. Dorland's Illustrated Medical Dictionary 168 (33rd Ed. 2020).

dizziness. Tr. 416. In Adkins's discharge summary, her treating physician indicated that Adkins had degenerative changes at L4–L5 with narrowing of the subarticular recesses, possible compression of the left L5 nerve root, and moderate bilateral foraminal narrowing.[6] Tr. 416. Adkins had moderate to severe foraminal narrowing at L5–S1. *Id.* The doctor prescribed Flexeril and Antivert and suggested that Adkins continue to take Naproxen as needed. Tr. 417. He directed Adkins to follow up with her primary care provider. *See id.*

A February 2020 MRI showed degenerative disc bulging with associated spinal canal stenosis, cord flattening at C4–C5 worse than at C5–C6, and severe bilateral foraminal narrowing. Tr. 414. The results also showed a lesser degree of disc bulging at C6–C7 without significant canal narrowing. *Id.* In Adkins's thoracic spine, an MRI showed mild to moderate kyphotic curvature[7] and mild to moderate multilevel degenerative changes with multilevel small disc protrusions. Tr. 447.

In early March 2020, surgeon Robert Raymond Crowell, M.D., of Marion Area Physicians Spine Surgery, reviewed examination results, including x-rays, and cleared Adkins for cervical spinal fusion surgery. Tr. 341. Dr.

---

[6]    Foraminal stenosis happens when the spinal nerves are compressed due to a narrowing in a part of the spine. *Foraminal Stenosis*, Cleveland Clinic Diseases & Conditions, https://my.clevelandclinic.org/health/diseases/24856-foraminal-stenosis [https://perma.cc/JCT6-HVGZ].

[7]    Kyphosis is the exaggerated, forward rounding of the upper back. https://www.mayoclinic.org/diseases-conditions/kyphosis/symptoms-causes/syc-20374205 [https://perma.cc/E6NC-ZP8C].

Crowell listed Adkins's pre-operation diagnoses as cervical disc herniation at C4–C5 and C5–C6 and cervical spondylotic myelopathy.[8] Tr. 345. The examination also showed that Adkins's thoracic spine had mild degenerative changes. Tr. 341. Dr. Crowell performed spinal fusion surgery on Adkins's spine at C4–C5 and C5–C6. Tr. 190, 343, 794, 799.

A post-operative x-ray of Adkins's cervical spine from May 2020 showed that the graft spacers, anterior screw, and stabilization plate hardware between Adkins's C4–C6 were stable and maintaining their positions. Tr. 519. In June 2020, Adkins had an appointment with Dr. Crowell during which she reported pain in her neck. Tr. 364. She indicated that she no longer felt that she could lift a 50-pound bag or carry it up a ladder as required by her job. *Id.* Later that month, Adkins sought emergency medical care at Marion General Hospital. Tr. 487–509. She reported that she "[t]hought she was having a heart attack" when she began having pain in her shoulder blades and numbness in her shoulders. Tr. 496–97. Adkins described the pain as similar to how she felt before her spinal fusion. Tr. 497. X-rays showed post-surgical findings consistent with cervical spinal fusion. Tr. 506. Adkins's treating physician

---

[8]     Cervical spondylotic myelopathy happens when the spinal cord in the neck becomes compressed. *Cervical Spondylotic Myelopathy (Spinal Cord Compression)*, OrthoInfo, https://orthoinfo.aaos.org/en/diseases-conditions/cervical-spondylotic-myelopathy-spinal-cord-compression/ [https://perma.cc/29H5-473U].

5

discharged Adkins with a prescription for Vistaril[9] to be taken as needed. Tr. 496–97.

At a physical therapy appointment in July 2020, Adkins reported continued pain, which she "rat[ed] at 5/10." Tr. 550. Physical therapist Michelle Kinn diagnosed trapezius muscle spasms and shoulder pain. Tr. 550. In an August 2020 questionnaire, Adkins reported abnormal sensations in her ears, face, and neck including numbness, tightness, and ringing in her ears. Tr. 229–35. When Antonio E. Collazo, M.D., examined Adkins at Marion Area Physicians in January 2021, he found that Adkins's surgical wound was well-healed and noted that she had no facial nerve deficit. Tr. 801.

In March 2021, Adkins saw Dr. Crowell for a follow-up. Tr. 722–38. X-rays of Adkins's cervical spine showed that her fusion remained intact. Tr. 721. Her pre-existing degenerative changes above the fusion at C1–C2 and C3–C4 had not progressed. *Id*. Below the fusion, Adkins had pre-existing disc space narrowing at C6–C7 with mild endplate sclerosis and spurring that also had not progressed. *Id*. Adkins's remaining disc spaces and vertebral bodies had maintained their heights. *Id*. Dr. Crowell did not find any evidence of fracture, subluxation, spinal cord compromise, or nerve root compression. *Id*. He noted that the visible portions of Adkins's upper thorax were unremarkable. Tr. 575.

---

[9]    Hydroxyzine, also known by the brand name Vistaril, is an antihistamine approved for use as a sedative to treat anxiety and tension. *Vistaril (Hydroxyzine)*, RX List, https://www.rxlist.com/vistaril-drug.htm [https://perma.cc/PW9K-F8KJ].

In April 2021, Adkins sought emergency medical treatment at Marion General Hospital for dizziness. Tr. 372. During her evaluation, in addition to dizziness, Adkins complained of tinnitus in her left ear, numbness and tingling to the left side of her face, and muscle cramping in her shoulders and neck. Tr. 750. Lab results, MRI, and EKG were normal. Tr. 372. Adkins was able to walk around the emergency department without noticeable difficulty. *Id*. Although an infusion of saline and Meclizine did not significantly improve Adkins's symptoms, Adkins's treating physician discharged her with a prescription for Meclizine. *Id*. The treating physician otherwise maintained Adkins's treatment regimen of medication and "strongly recommend[ed]" that she follow-up with her primary care provider within two or three days. Tr. 372

*Left shoulder issues.* In June 2020, Adkins complained of pain and "popping" in her shoulder. Tr. 521. X-rays showed normal alignment, no injury to the bones, and mild left acromioclavicular joint arthropathy.[10] Tr. 522. In December 2020, Adkins saw nurse practitioner Rollins at Marion Area Physicians for pain that she said she'd had "for a while" in her left scapula. Tr. 691. Adkins reported having completed a course of physical therapy for her back and shoulder, but that it had not improved her scapular pain. *Id*. Rollins

---

[10]    The acromion is the lateral extension of the scapula that projects over the shoulder joint and forms the highest point of the shoulder. Dorland's Illustrated Medical Dictionary 20 (33rd ed. 2020). Acromioclavicular pertains to the articulation between the acromion and the clavicle. *Id*. Arthropathy can refer to any joint disease. *Id*. at 155.

refilled Adkins's prescription for Flexiril[11] and encouraged Adkins to use massage, heat, and ice to relieve the shoulder pain. *Id*. She provided Adkins with exercises for shoulder pain. Tr. 691. Rollins informed Adkins that if the shoulder pain didn't improve, she would consider referring Adkins for a second round of physical therapy. *Id*.

*Knee issues*. Adkins complained of pain in her knees throughout the relevant time period. *See, e.g.,* Tr. 190, 613, 810–12, 816. In February 2020, Adkins had an appointment with Rollins at Marion Area Physicians. Tr. 606–15. Rollins found that Adkins had a normal gait and range of motion with full motor strength. *Id*. Adkins's circulation and reflexes were normal. *Id*. She had no atrophy in her upper or lower extremities and was able to walk without any assistive device. *Id*. During an appointment in January 2021, Adkins reported that she had previously had a scoping procedure on her right knee. Tr. 799. In June 2021, Brent Cameron Mellis, D.O., ordered a computed tomography scan of Adkins's left hip, knee, and ankle for preoperative planning in anticipation of left knee surgery. Tr. 811–12. The results showed degenerative changes in Adkins's left knee without any "acute osseous abnormality." Tr. 811–12. Adkins had moderate to severe tricompartmental osteoarthritis, most significant in the medial compartment,[12] and moderate joint effusion. Tr. 812.

---

[11]     Rollins directed Adkins to take Flexiril up to three times daily for muscle spasms. Tr. 691.

[12]     Tricompartmental osteoarthritis is a type of osteoarthritis that affects all three of the compartments in the knee. Neel Duggal, medically reviewed by

Dr. Mellis performed left knee replacement surgery in June 2021.[13] Tr. 42, 806, 816–17.

*Obesity*. During the hearing, Adkins testified that she was five feet, two inches tall and weighed 203 pounds. Tr. 40. According to the ALJ, these figures resulted in a Body Mass Index (BMI) of 37.1. Individuals with a BMI of 30 or greater are considered obese. *Id.*

*Mental health*. Adkins has not had formal psychiatric or mental health care. She alleges that she suffered from major depressive disorder and anxiety during the relevant time period. *See* Doc. 6, at 4 (citing Tr. 489, 555–57). During a visit to the Marion General Hospital emergency department in June 2020, her treating physician opined that Adkins had an "episode of anxiety." Tr. 489. Adkins began to hyperventilate and the doctor administered Atarax, which relieved Adkins's symptoms. Tr. 489. Her treating physician suspected that Adkins had anxiety with panic attacks. Tr. 489, 494. She suggested that Adkins follow-up with a primary care physician. Tr. 489. Three days later,

---

Brenda B. Spriggs, M.D., MPH, FACP, *Everything You Should Know About Tricompartmental Osteoarthritis*, Healthline, https://www.healthline.com/health/osteoarthritis/tricompartmental-osteoarthritis [https://perma.cc/E9KU-33SF].

[13]     Although the fact that Adkins had knee surgery is undisputed, the pages cited by the parties don't clearly support that fact. The Commissioner cites page 806, which shows that Adkins was swabbed for a pre-surgery COVID test. *See* Doc. 9, at 4. But page 806 merely shows that as of June 11, 2021, Adkins's surgery was scheduled to take place four days later. Adkins cites pages 816–17 of the transcript. *See* Doc. 6, at 4. Those pages, however, are treatment notes from an April 2021 office visit at which Adkins decided to have knee surgery. Tr. 817.

Adkins saw nurse practitioner Rollins at Marion Area Physicians. Tr. 640–56. Rollins noted that she had previously discussed with Adkins her anxiety but Adkins had declined treatment. Tr. 649. Adkins reported that her anxiety had been elevated due to raising her grandchildren, her spinal surgery, and "being taken off work permanently." *Id.* Adkins reported that as to her anxiety, she was doing well, was taking Hydroxyzine two to three times per day, and would prefer to continue doing "just that." *Id.*

### 4. State agency and other medical opinion evidence[14]

In July 2020, state agency physician Leon Hughes, M.D., reviewed the medical evidence. Tr. 69–74. Dr. Hughes found that Adkins had physical impairments including spinal fusion and degenerative changes in her knee with chronic pain, and that Adkins's statements appeared consistent with the objective medical evidence. Tr. 72. Dr. Hughes found, however, that Adkins maintained the ability to perform light, unskilled work with additional limitations. Tr. 73.

Dr. Hughes found that Adkins retained the physical RFC to frequently lift or carry 10 pounds and occasionally lift or carry 20 pounds. Tr. 72. Adkins

---

[14]     When a claimant applies for disability benefits, the state agency creates a record. The record includes the claimant's medical evidence. A state agency disability examiner and a state agency physician or psychologist review the claimant's record and determine whether and to what extent the claimant's condition affects his or her ability to work. If the state agency denies the claimant's application, the claimant can ask for reconsideration. On reconsideration, the state agency updates the record and a second disability examiner and doctor review the file and make a new determination. *See, e.g.*, 20 C.F.R. § 404.1615.

could sit, stand, or walk for a total of about six hours in an eight-hour workday. *Id*. She could frequently balance. *Id*. She could occasionally climb ramps, stairs, ladders, ropes, or scaffolds. *Id*. She could occasionally stoop, kneel, crouch, or crawl. *Id*. The initial disability determination noted that there were no mental RFC claims associated with Adkins's application. Tr. 73.

In October 2020, Bryan Krabbe, Psy.D., conducted a clinical interview and evaluated Adkins's mental status. Tr. 553. Adkins indicated that she had never had psychotherapy but reported a history of panic attacks, depression, poor quality of mood, feelings of worthlessness, loss of energy, insomnia, decreased motivation, problems concentrating, issues with social withdrawal, and crying spells. Tr. 555–57. Dr. Krabbe opined that Adkins had major depressive disorder with difficulty concentrating. Tr. 557–58.

In November 2020, upon reconsideration, state agency physician Elizabeth Das, M.D., reviewed the medical evidence. Tr. 75–83. Dr. Das affirmed Dr. Hughes's physical RFC findings, except that Dr. Das found that Adkins was limited due to neck rigidity from her then-recent spinal fusion surgery. Tr. 81. Dr. Das thus opined that the RFC should include manipulation limitations and prohibit frequent overhead work. Tr. 81, 82–83.

In November 2020, during reconsideration, state agency psychologist Aracelis Rivera, Psy.D., reviewed the medical evidence. Tr. 78–82. Dr. Rivera found that Adkins was limited in her ability to sustain concentration and persistence and in her ability to adapt. Tr. 81–82. Specifically, Dr. Rivera found

that Adkins was moderately limited in her ability to: (1) maintain attention and concentration for extended periods; (2) complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and (3) respond appropriately to changes in the work setting. Tr. 81–82. Dr. Rivera found that Adkins could adapt to a work setting in which duties were routine and predictable. Tr. 82.

Dr. Rivera found that Adkins was not significantly limited in the ability to carry out detailed instructions. Tr. 81.

Dr. Rivera further opined that there was no evidence of limitation in Adkins's ability to: (1) carry out very short and simple instructions; (2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being distracted by them; (5) make simple, work-related decisions; (6) be aware of normal hazards and take appropriate precautions; (7) travel in unfamiliar places or use public transportation; or (8) set realistic goals or make plans independently of others. Tr. 81–82.

### 5. *Testimonial evidence*

Adkins and a vocational expert testified during the hearing in June 2021. Tr. 32. Adkins was represented by attorney Mindy Yocum. Tr. 32, 36–40, 53–63, 66–67. Attorney Yocum began the substantive portion of the hearing

with an opening statement advocating that the ALJ find Adkins disabled due to the severe impairments of degenerative disc disease of the cervical and lumbar spine, cervical spinal fusion surgery, cervical spondylosis with myelopathy, cervical radiculopathy, chronic left shoulder pain, sciatica in the lower extremities, osteoarthritis in both knees, knew replacement surgery, COPD, asthma, depression and anxiety, tinnitus, and dizziness. Tr. 39–40.

Adkins lived with her fiancé and her two teenaged granddaughters, whom she was raising. *Id.* She had a driver's license but wasn't "raring to" drive due to her recent knee replacement surgery. Tr. 42.

Adkins could stand for about an hour and walk for up to an hour and a half to two hours. Tr. 46–47. After that, she would need to sit down. *Id.* Adkins was able to walk or stand for longer but needed to use a cart or a wall for support. Tr. 47. She would also need to sit for 15 to 20 minutes before walking or standing again. *Id.* Adkins could sit for a total of 30 minutes before she would need to stand up to stretch. *Id.* She could lift approximately 25 pounds but lifting and carrying things caused pain in her neck, shoulder, and dominant left arm. Tr. 48. Adkins had difficulty reaching up, such as when she put her hair into a ponytail or reached into a cupboard. Tr. 48–49.

After Adkins, vocational expert Julie Bose testified. Tr. 63–67. Bose classified Adkins's job at the popcorn factory as heavy, unskilled work. Tr. 64. Bose said that a hypothetical individual with the same age, education, and work experience as Adkins would not be able to perform Adkins's past work

if he or she had the limitations assessed in Adkins's RFC, described below. Tr. 65. Bose noted, however, that unskilled light work such as an office helper, storage facility clerk, and order caller would still be available to such an individual. *Id*. All work would be precluded if, on an ongoing basis, such an individual needed to take a daily, unscheduled break to recline for up to 45 minutes. Tr. 65–66. A restriction to only occasional reaching in all directions with his or her dominant arm would also prohibit all work, Tr. 66, as would being off task for 15 percent or more of the workday or being absent an average of two days or more per month, Tr. 67.

### The ALJ's decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2025.

2. The claimant has not engaged in substantial gainful activity since February 27, 2020, the alleged onset date (20 CFR 404.1571 *et seq*.).

3. The claimant has the following severe impairment: fusion surgery of the cervical spine at C4-5; degenerative changes of the thoracic spine; lumbar degenerative disc disease with foraminal narrowing; acromioclavicular joint arthropathy of the left shoulder; osteoarthritis of the knees with recent left knee replacement surgery; obesity; and major depressive disorder (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P,

Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, I find that the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b). In addition, the claimant can occasionally reach overhead. She can stand no more than one hour at a time, at which point she would need to sit for approximately 15-20 minutes. If seated, the claimant would need to stand at least briefly, for a few minutes, after approximately 30 minutes. She can occasionally climb ramps and stairs. The claimant should never climb ladders, ropes, or scaffolds. She can frequently balance. The claimant can occasionally stoop. She should never kneel, crouch, or crawl. The claimant can tolerate a moderate noise level as defined in the Selected Characteristics of Occupations. She should not be exposed to extreme heat. In terms of her mental limitations, the claimant can sustain the concentration necessary to carry out simple and moderately complex tasks in which duties are routine and predictable, and do not require that she maintain a fast pace or satisfy strict production quotas.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born [in November] 1967 and was 52 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 27, 2020, through the date of this decision (20 CFR 404.1520(g)).

Tr. 17–27.

## Standard for disability

Eligibility for benefit payments depends on the existence of a disability. 42 U.S.C. §§ 423(a, 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

An ALJ is required to follow a five-step sequential analysis to make a disability determination:

1. Is the claimant engaged in substantial gainful activity? If so, the claimant is not disabled.

2. Does the claimant have a medically determinable impairment, or a combination of impairments, that is "severe"? If not, the claimant is not disabled.

3. Does the claimant's impairment meet or equal one of the listed impairments and meet the duration requirement? If so, the claimant is disabled. If not, the ALJ proceeds to the next step.

16

4. What is the claimant's residual functional capacity, and can the claimant perform past relevant work? If so, the claimant is not disabled. If not, the ALJ proceeds to the next step.

5. Can the claimant do any other work considering the claimant's residual functional capacity, age, education, and work experience? If so, the claimant is not disabled. If not, the claimant is disabled.

20 C.F.R. §§ 404.1520, 404.1520. Under this sequential analysis, the claimant has the burden of proof at steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at step five to establish whether the claimant has the vocational factors to perform available work in the national economy. *Id.* If a claimant satisfies each element of the analysis and meets the duration requirements, the claimant is determined to be disabled. *Id.*

### Standard of review

A reviewing court must affirm the Commissioner's conclusions unless it determines "that the ALJ has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Jordan*, 548 F.3d at 422. "'[S]ubstantial evidence' is a 'term of art'" under which "a court ... asks whether" the "existing administrative record ... contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (citations omitted). The substantial evidence standard "is not high." *Id.* Substantial evidence "is 'more than a mere scintilla'" but it "means only[] 'such relevant evidence as a reasonable mind

17

might accept as adequate to support a conclusion.'" *Id.* (citations omitted). The Commissioner's "findings … as to any fact if supported by substantial evidence [are] conclusive." 42 U.S.C. § 405(g); *Biestek*, 139 S. Ct. at 1152.

A court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if substantial evidence or a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "'zone of choice within which'" the Commissioner can act, without fear of court "'interference.'" *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

## Discussion

Adkins challenges the ALJ's RFC determination and claims that it is not supported by substantial evidence. Doc. 6, at 6–7. An individual's RFC is "the maximum degree to which the individual retains the capacity for sustained performance of the physical-mental requirements of jobs." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 399 (6th Cir. 2018) (quoting 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 200.00(c)); *see also Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002) (explaining that an RFC is an "'assessment of'" a claimant's ability to work, taking his or her "limitations …

into account") (quoting 20 C.F.R. § 416.945). Here, the ALJ considered Adkins's maximum capacity and determined that Adkins was capable of light work as defined in 20 C.F.R. § 404.1567(b). The Social Security Administration defines the physical exertion requirements for light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

> The ALJ further limited Adkins, writing, in pertinent part:

> In addition, the claimant can occasionally reach overhead. She can stand no more than one hour at a time, at which point she would need to sit for approximately 15-20 minutes. If seated, the claimant would need to stand at least briefly, for a few minutes, after approximately 30 minutes.
>
> ….
>
> In terms of her mental limitations, the claimant can sustain the concentration necessary to carry out simple and moderately complex tasks in which duties are routine and predictable, and do not require that she maintain a fast pace or satisfy strict production quotas.

Tr. 21.

Adkins alleges that the ALJ failed to account for her physical impairments insofar as they prevented her from meeting the standing, walking, lifting, and carrying requirements set by the ALJ in the RFC. Doc. 6, at 7. Adkins further alleges that the ALJ failed to account for Adkins's mental impairments when determining the RFC. *Id.*

    1. *Whether the ALJ properly supported the RFC determination that Adkins was capable of sustaining the standing, walking, lifting, and carrying requirements of light work.*

Adkins alleges that the ALJ's RFC failed to account for the fact that Adkins had physical limitations which did not allow her to perform the requirements for light work, which she claims includes the requirement that she stand or walk for up to six hours in an eight-hour workday. Doc. 6, at 7. Adkins further alleges that she could not perform the RFC's lift and carry requirements. *Id.* Adkins's characterization disregards the standard of review, ignores the ALJ's decision, and neglects Adkins's own hearing testimony.

First, despite Adkins's framing of her argument, this Court is not responsible for determining whether, in fact, Adkins was capable of sustaining light work as set forth in the ALJ's RFC determination. *See* Doc. 6, at 7. That would be asking this Court to reweigh the evidence, which it cannot do. *Rottmann v. Comm'r of Soc. Sec.*, 817 F. App'x. 192, 196 (6th Cir. 2020). Adkins essentially argues that because substantial evidence supports her argument, substantial evidence doesn't support the ALJ's determination. *See* Doc. 6, at 9. Whether substantial evidence supports the conclusion that the RFC could have

been more restrictive than the ALJ found is, however, irrelevant because Adkins fails to show that the ALJ's RFC determination, that Adkins was capable of performing the standing, walking, lifting, and carrying requirements for light work, was *not* supported by substantial evidence. And "[s]o long as substantial evidence supports the conclusion reached by the ALJ," it doesn't matter if substantial evidence also supports a claimant's position. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

In support of her argument, Adkins cites her diagnoses, MRI and x-ray results, and subjective statements. Doc. 6, at 8–9. She alleges that substantial evidence does not support the ALJ's findings. *See* Doc. 6, at 7–9. But, as discussed below, the ALJ not only considered Adkins's evidence, she cited it in support of her findings. Tr. 23–24. Adkins also misinterprets the ALJ's RFC determination. She cites the Social Security Administration's definition of light work and Social Security Ruling 83-10, Doc. 6 at 7, but ignores the fact that the ALJ added additional restrictions to the RFC to account for her physical impairments. Tr. 21. The ALJ limited Adkins's standing, walking, lifting, and carrying obligations to a level below the usual "light work" requirements, thus Adkins argument fails. *Id*.

Moreover, substantial evidence cited by the ALJ supports the finding that despite spinal surgery, knee issues, and shoulder pain, Adkins was able to perform a reduced range of light work. Tr. 23–24.

Addressing Adkins's cervical spinal fusion surgery, the ALJ examined the post-operative notes and found that Adkins showed no evidence of any complication. Tr. 23 (citing Tr. 684). The ALJ considered x-rays of Adkins's cervical spine that "revealed stable graft placements and anterior stabilization hardware." *Id.* (citing Tr. 519). She found that there was "no evidence the claimant's cervical spine surgery was unsuccessful or complicated." *Id.* The ALJ acknowledged that Adkins complained of dizziness, lightheadedness, and abnormal sensations in her ears, face, and neck after the surgery. *Id.* The ALJ noted, however, that in post-surgery physical examinations, Adkins's wounds were well-healed and her facial nerves were normal. Tr. 23 (citing Tr. 801). She highlighted March 2021 "studies of [Adkins's] cervical spine" demonstrating that her surgery remained "solid." Tr. 23. The ALJ detailed consideration of the degenerative changes in Adkins's spine that, as of March 2021, had not progressed, Tr. 23 (citing Tr. 721), and Adkins's normal brain as shown in an April 2021 MRI, *id.* (citing Tr. 372). The ALJ noted that the level of care Adkins required for her cervical spine issues was static and consisted mainly of medication. Tr. 23. There was no evidence that the fusion had failed or that Adkins was "a candidate for any more spine surgeries." *Id.*

The ALJ's consideration of Adkins's joint issues focused on Adkins's knees and left shoulder. Tr. 23. The ALJ recognized Adkins's history of knee problems including a scoping procedure that pre-dated the relevant time period. *Id.* The ALJ credited Adkins as having demonstrated that she had

"severe tri-compartmental osteoarthritis most significant in the medial compartment" of her left knee. Tr. 23 (citing Tr. 810). Although Adkins reported pain and limitations in her knees, the ALJ noted that the objective medical evidence showed that Adkins had "full motor strength, sensitivity, and range of motion in her joints." Tr. 23. Adkins's providers found her to have "normal circulation and reflexes" and noted her ability to "walk without assistive devices at her baseline." Tr. 23 (citing Tr. 613). As to Adkins's June 2021 knee surgery, the ALJ found that "there was no evidence the surgery was unsuccessful or complicated" and that "[t]here  was no reason to expect the claimant's function was not expected to improve." Tr. 23 (citing Tr. 806). The ALJ addressed Adkins's left shoulder, in which Adkins had "mild left acromioclavicular joint arthropathy … with no osseous injury and normal alignment." *Id.* (citing Tr. 522). She noted, however, that Adkins's providers treated the pain with physical therapy and medication. Id. (citing Tr. 691). The ALJ found that there was "no evidence of atrophy in the claimant's upper or lower extremities." Tr. 23.

Also, Adkins's own testimony undermines the argument that her maximum ability to stand, walk, lift, and carry should have been lower than the ALJ found. In fact, the ALJ's findings come directly from the estimates Adkins made during the hearing.

During the hearing, Adkins told the ALJ that she could stand for about an hour at a time before she would need to sit down. Tr. 46. She testified that

if she were walking, she had "about an hour and a half, two hours" before she would need to sit down again. *Id*. Adkins said that the minimum amount of time that she would need to sit before she could get back up again and be on her feet for another hour was "15, 20 minutes at most." Tr. 48. Taking Adkins's testimony into account, the ALJ determined that Adkins could "stand no more than one hour at a time, at which point she would need to sit for approximately 15-20 minutes." Tr. 21.

Adkins also said that she could sit in an upright position for "about 30 minutes before [she'd have] to get up and … walk for a couple of minutes and … stretch out." Tr. 47. And the ALJ determined  that "[i]f seated," Adkins "would need to stand at least briefly, for a few minutes, after approximately 30 minutes." Tr. 21.

As to lifting and carrying, Adkins said that from the time she stopped working until her recent knee surgery, she could usually carry "about 20 pounds. Maybe 25, at the most." Tr. 48. This is beyond the normal range for light work, which requires an individual to frequently lift or carry 10 pounds and occasionally lift or carry 20 pounds. *See* 20 C.F.R. § 404.1567(b).

The ALJ determined that Adkins was capable of light work as defined in 20 C.F.R. § 404.1567(b) and accounted for the additional limitations on reaching, especially with her dominant left hand, as explained by Adkins. *See* Tr. 21, 49. As such, the ALJ's determinations regarding Adkins's physical RFC

24

are supported by substantial evidence in the record and Adkins fails to show otherwise.

2. *Whether the ALJ's mental RFC determination properly accounted for Adkins's alleged mental impairments.*

In the RFC determination, the ALJ found that Adkins could sustain the concentration necessary to carry out simple and moderately complex tasks in which duties were routine and predictable, as long as she would not be required to maintain a fast pace or satisfy strict production quotas. Tr. 21. Adkins claims that the ALJ did not adequately account for Adkins's mental limitations—moderate limitations in concentration, persistence, and pace—in developing the RFC. Doc. 6, at 9–11.

Adkins again disregards the standard of review and improperly asks the Court to reweigh the evidence. Adkins's argument also misreads the ALJ's mental RFC determination, which is supported by substantial evidence in the record. She fails to demonstrate her allegedly disabling mental limitations and supports her claims with speculation instead of fact. As such, the Commissioner's decision should be upheld.

Adkins's argument disregards the ALJ's decision and her adoption of the very medical opinions Adkins claims were overlooked. Adkins claims that the ALJ failed to account for the psychological medical opinion findings that Adkins was moderately limited in the ability to concentrate, persist, or keep pace. Doc. 6, at 9–10. In support of this argument, Adkins highlights the medical opinion of consultative examining psychologist Dr. Krabbe and the

prior administrative findings of state agency consultative psychologist Dr. Rivera. Doc. 6, at 9–11.

As cited by Adkins, Dr. Krabbe found that Adkins had major depressive disorder and reported symptoms including poor quality of mood, feelings of worthlessness, lack of energy, insomnia, decreased motivation, problems with concentration, social withdrawal, and crying spells. Doc. 6, at 10 (citing Tr. 557). Adkins also notes that Dr. Krabbe found that Adkins's symptoms of depression could result in increased worry and a corresponding decrease in attention and concentration and may compromise her ability to respond to work pressures leading to increased emotional stability and withdraw. *Id.* (citing Tr. 558).

Adkins also cites to the medical opinion of  Dr. Rivera, who reviewed updated record evidence, including Dr. Krabbe's report. Tr. 77–78. Dr. Rivera found that even with moderate limitations in the ability to concentrate, persist, or keep pace, and the ability to adapt or manage herself, Adkins retained the capacity to "carry out simple and moderately complex tasks in which duties are routine and predictable, with no demands for fast pace or high production," and could "adapt to a setting in which duties are routine and predictable." Tr. 81–82.

Adkins argues that the ALJ's residual functional capacity determination failed to adequately address the limitations established by the findings of Doctors Krabbe and Rivera. The ALJ, however, explicitly cited both clinicians

and incorporated their assessments into Adkins's mental RFC. *See* Tr. 9–10, 25. The ALJ wrote, "[i]n terms of her mental limitations, the claimant can sustain the concentration necessary to carry out simple and moderately complex tasks in which duties are routine and predictable, and do not require that she maintain a fast pace or satisfy strict production quotas." Tr. 21. In requesting that the Court determine whether, in fact, the limitations contained in Adkins's RFC were sufficient, or "fully convey[ed] Ms. Adkins's limitations in concentration, persistence, or pace to the vocational expert," Adkins is once again asking this Court to reweigh evidence, which it cannot do. *See Rottmann*, 817 F. App'x. at 196.

Moreover, the ALJ's mental RFC determination is supported by substantial evidence in the record. Adkins's providers regularly found her behavior, judgment, and thought content normal as shown in the treatment notes. *See, e.g.*, Tr. 599, 610, 612-13, 653, 672. During the relevant time period, Adkins did not require specialized psychiatric care on an emergency or inpatient basis. There is no evidence that Adkins engaged with, or required, formal mental health therapy or counseling. Adkins supports her position by arguing that as a result of the limitations in concentration, persistence, or pace and adaptability found by Dr. Krabbe and Dr. Rivera, Adkins "may be unable to meet quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job." Doc. 6, at 11. This is purely speculative, and does not sufficiently show a disabling limitation. Adkins thus fails to meet her burden.

## Conclusion

For the reasons explained above, I recommend that the Court affirm the Commissioner's decision.

Dated: August 7, 2023

> /s/ James E. Grimes Jr.
> James E. Grimes Jr.
> U.S. Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *See Berkshire v. Beauvais*, 928 F.3d 520, 530–531 (6th Cir. 2019)**.**